Good morning. May it please the Court, I'm Karen Landau, and I represent Eva Batalla and Mr. Getz, who represents Mr. Williams, and I will be splitting our time. Preliminarily, I'd like to note, my client, the government, has conceded that both defendants should get amyline remands, and, well, I believe Mr. Getz has an argument, a separate sentencing argument. I'd just like to ask that, given that it's agreed that my client should get an amyline remand, I would like this Court to expedite, or at least to consider remanding it on an expedited basis. She is scheduled to be released in May of next year. Her total sentence is 18 months. So if the Court doesn't have the opportunity to consider reducing her sentence, she will have served it all, making any remand moot.  CHIEF JUSTICE KENNEDY We're fast.  Pardon? CHIEF JUSTICE KENNEDY We're fast. KAREN LANDAU Thank you, Your Honor. I did expedite this appeal, but it's still taken some time. CHIEF JUSTICE KENNEDY Well, weren't you with our staff? KAREN LANDAU I was, Your Honor. I was. CHIEF JUSTICE KENNEDY Well, you know where the delays are. KAREN LANDAU That's why I'm asking. I do know, Your Honor. I'd just like to briefly address the issue of prosecutorial misconduct, and then I'll turn it over to Mr. Getz. In this case, we had two defendants, and because of the nature of the evidence, it was very important that the jury consider the evidence against them separately. My client was romantically involved with Mr. Williams, who actually owned the business in which the fraud was alleged to have occurred, and she also worked for him. And in closing, what the government did and exactly what the government said is set forth in the brief and in the excerpts. The government lumped the two defendants together, and in particular, the government prosecutor referred to the fact and that they basically both benefited financially, and that is the problem with the argument. In fact, there was no evidence that my client, Ms. Batalla, had any access to the bank accounts at all. The government did make clear, of course, that the money structuring charges were alleged only against Mr. Williams, but really did argue that my client had sort of implied that my client had some sort of financial benefit. Now, in their — Assuming it's error, why is it plain error? Well, Your Honor, it's plain error because it affected her substantial rights. It would certainly have been preferable if defense counsel had objected. But the problem is, is that here, it was — I mean, the government did have a strong documentary case, but the only issue for the trial was knowledge. And my client testified on her own behalf, and she also presented a character witness. And the character witness was not impeached at all. And, in fact, because credibility was the critical issue, any slight scintilla of — it makes the misconduct that much more significant. And I would — you know, the case I cited, too, in my brief was the Weatherspoon case. And in that case, granted, it was a somewhat different type of misconduct, but the key thing about the Weatherspoon case is that there we had — it was a felon in possession of a firearm charge, and the gun was actually found under the seat that he was sitting in, and there were other people in the car. And he argued, well, the gun's not mine. It was equivocal whether — who the gun belonged to. But in that case, that is a case where this court reversed for plain error because of the importance of credibility to the trial. And that is the situation here. You know, my client was — you know, there was — I mean, I won't deny the government had the documents. There was evidence against her, but she was in a different position than Mr. Williams. She didn't own the business. She didn't have the financial motive. And, you know, it was really the only — and so adding that financial motive in, that is the plain error. I did just want to briefly address — you know, the government has argued in its brief that it was a reasonable inference from the evidence because the government introduced evidence that Mr. Williams took the money out of the bank account and, among other things, took him — took Ms. Battalla and his two children to London on a trip. And I would submit that's just not enough to allow a reasonable inference. The kind of evidence you would need to argue that she had a connection and got a financial gain from it would be the kind of thing like, you know, that she got some — I mean, there was no indication of her salary, that she got some kind of heightened salary or some kind of cash bonus for participating in the fraud. It was just nothing like that. If there's no questions on that issue, I'd be happy to submit and allow Mr. Goetz. Are you pursuing an ex post facto claim? No, Your Honor. I don't have one because my client was sentenced under the correct guidelines. My client was sentenced under the 2000 guidelines, and those were the guidelines that were in effect at the time the offense was committed. She did — that's where we have different claims. Thank you. Sure. May it please the Court, Brian Goetz on behalf of Cornelius Williams. We are asking for more than the limited remand that is enunciated in Ammaline. We're asking this Court to vacate the sentence and send it back for a full sentencing hearing, a full rehearing where Mr. Williams can be personally present for allocution and where all his sentencing requests can be fully made. We think we're entitled to that because there were enough errors and enough plain error in the Court below to justify it. In a situation where there is confusion, this Court has said to avoid confusion, we vacate the sentence and send it back for a full hearing. That was the United States v. Gunning. There was an abundance of confusion at the District Court during the sentencing hearing. For one thing, the District Court made it clear that the guideline range of 41 to 50 was the appropriate one, and it now appears that the guideline range was much lower, 21 to 30.  The District Court used the wrong guideline manual, ignoring the mandate of United States v. Ortlin, which inured to the detriment of Mr. Williams because he scored significantly more points than he would have scored had the older manual been used, so that was a separate error. We've also raised the issue of whether or not the conviction of the 1001 should have been scored as two extra points under the circumstances. There was an abundance of error in the District Court's sentencing hearing, and we then have to ask, is this a situation that can be corrected with an Ammaline remand? There is the issue of the public's trust, the integrity of the proceedings, and how things appear. It's interesting also, in the majority opinion in Ammaline, that Justice Rawlinson wrote about how it looked from the defendant's point of view. I can't remember a recent case that did that, but Justice Rawlinson said that it is inappropriate to have a procedure where the defendant feels abused. Think how Mr. Williams felt being active and participating in the preparation of his case as he was. He was out on bond at that time and eventually self-surrendered following sentencing, but he was out on bond during the proceedings, during the trial, and during the sentencing hearing, and for several weeks thereafter, participating with his lawyer and urging his lawyer to make an argument that would result in a guideline range of 23 to 30 months. Then he sits through the court proceedings in District Court after the trial, and hears the judge say, no, it's 41 to 50. Think of the shock that somebody would experience going through that, and then think of the further shock when he, having told his lawyer to use an older guidelines manual, gets a higher score because of a different one. Think how that would make somebody feel. And then think, if it's an Ammaline remand and it goes back down to District Court and comes back the same 41 months, think how that appears. In some ways, an Ammaline remand that results in the same sentence as we have here would really make a mockery of the proceedings in District Court. It would be much more fair, it would be much more appropriate to vacate the sentence, send it back for a rehearing, give Mr. Williams a chance for full allocution under the conditions for which he now would be speaking, and allow him to have a new day in court. That's what we're requesting. What would he say then? Pardon? What would he say then, with his new day in court? What would he say then? Yes. Well, for one thing, he would be... This involves $186,000 in fraudulent credit card transactions. Yes. That's a lot of money. It's a tremendous amount of money, but I would just ask the Court to consider this. $186,000 was also the restitution amount for Ms. Battaglia, and the District Court judge saw fit to give her 18 months. So while I know that the cases are not the same, if one co-defendant receives 18 months and the other one is facing a guideline range of 23 to 30, doesn't it seem reasonable that at a full sentencing hearing with allocution, at a fresh look at this, the District Court judge would come in somewhere between 23 and 30? And doesn't it also seem that if the guideline range that the District Court selected, 41 to 50, and the District Court judge says, I'll give this individual 41 months because he has no prior convictions, under those circumstances, doesn't it seem correct that if the guideline range are 23 to 30, the judge would come down a lot closer to 23 than 30? And even if he didn't come in closer to 23 than 30, isn't that meritorious of a full-blown sentencing hearing instead of an Ammaline remand? Doesn't this case, more than most others, cry out for a full rehearing instead of an Ammaline second look? The Court should take a risk on that, too. And we welcome that risk, Your Honor. And get a higher sentence. We can get a higher sentence, which is, of course, what happened in U.S. v. Fanfan. But in U.S. v. Fanfan, the defendant was trying to avoid the resentencing. And I think, to use Your Honor's hypothetical, if we go back in there and the District Court announces a sentence that's worse than the one we have, there's going to have to be a reasonable basis for it, and there's going to be a reasonable recitation of the factors that would result in a higher number. And if I read Ammaline correctly, and I read it a few times this morning, if the sentence is not reasonable, we would be able to come back here. So we'll take our chances, and we'd like to go back with the full hearing to District Court. Thank you. All right, we'll hear from the government. May it please the Court, Damian Martinez for the United States, Central District of California. With respect to the misconduct argument, I want to focus more specifically on what the statements were that Ms. Batalla alleges were misconduct, because Ms. Booker didn't accurately describe them in her argument. In particular, what I said in my closing at GER 157, 158, is that the defendants were running the cards through the machines, and that's what happened in this case, is that the cash came into the possession of the defendants. Next sentence is, And you saw that when you, how the money was taken out of the bank account, the bank account in which all the money was deposited from these credit card transactions. You have to keep your voice up. Oh, I'm sorry, Your Honor. We have a very interested audience. Well, I'm happy about that. The next statement was that the defendants were going through a tough financial time prior to the commission of the crime in the year 2000, and I referenced them in the plural, that they had been evicted, or eviction proceedings had begun against them eight different times, and at the end of that second passage that is challenged by Ms. Batalla, I said they used the business, they used the credit card, and they used the bank account that got the money from the credit card charges, and that's at GER 159. And the point of these two statements, Your Honors, is simply that Ms. Batalla was not an innocent employee of the business one, which was the site of the fraud. She was a member of the conspiracy, and this conspiracy, simply put, did come into the possession of the $186,000 of fraudulent charges. That's a lot more than you said at the time, though. I'm sorry, Your Honor? That's a lot more than you said at the time. All you said, you spoke generically, and she has a point that you have to stretch to get that nuance out of it, that you were talking about conspiracy and raising inferences and so forth. You did use the plural. That's correct, Your Honor, but my point with respect to the first passage is that Ms. Batalla was a member of this conspiracy, and by her own admission when she testified, she said she ran every single credit card that was subject to the fraudulent charges through the machine. So she placed herself there at the center of the fraud. She also said that she prepared the invoices that were connected to the fraudulent charges and that she obtained a manual credit card for the fraudulent charges. Those facts, Your Honor, give rise to the inferences of what I said in these two separate passages, that as a result of the fraudulent charges, the defendants came into the possession of the money. The second point was that this conspiracy was not simply a random person conspiring with another random person. These two people were romantically involved. They were residing together, and Mr. Williams was the owner of the business, and Ms. Batalla was the sole employee of the business. As such, it stands to reason that what would benefit Mr. Williams would also benefit Ms. Batalla, given the fact that they were in a romantic relationship, and also given the fact, as presented at trial, that Mr. Williams purchased a ticket to London immediately after the fraud for Ms. Batalla using the proceeds of the fraud. Besides the facts I've just mentioned, in addition, Ms. Batalla said that she handled every single transaction, and many of these transactions occurred five minutes apart from each other. Twenty-nine of them occurred after 5 p.m. These were facts that I argue to the jury gave rise to the conclusion that she was an active member of the fraud. Right. But in fairness, and whether or not it's reversible or not is another question, she didn't – there's no evidence that she withdrew from the bank accounts herself, right? Well, Your Honor, I didn't say in my closing that she withdrew the money from the bank.  I did say that, Your Honor. I said the – And she didn't use the bank accounts, right? Well, that is the only point I would say is factually – You can concede something, can't you? Well, I don't want to concede it was error. I will concede that it was predicated on an inference from the facts, and that when conspirators engage in fraud, the purpose is to obtain cash, obtain money. And in this case, the conspiracy utilized the Business I bank account to obtain the cash. So what did you use – what did you use to plural that? Your Honor, another way might have been to say this conspiracy used three different tools to execute the fraud. They used the business – or the conspiracy utilized the business. The conspiracy utilized the credit card charger. The conspiracy used the business. Well, the business in December – Used is a better word than utilized. You're correct. Your Honor is correct. Used the business, used the charger, and used the bank account to carry out the fraud. Besides these limited statements in the closing argument, there was nothing else besides these isolated passages to lead the jury to a conclusion that this defendant, Batala, was involved in the structuring or was involved in physically taking the cash from the bank. On that account, the government argues – I argue that the jury could not have been confused about the isolated passages that I made. In other words, they were not in a position to think that I was trying to say anything more than that defendant Batala was involved in the conspiracy to carry out the access device fraud. After the specific passages, I went on and discussed Williams' specific involvement in the access device fraud, in the structuring fraud, and then in the false statement. That's at GER 163s, 167s. So these specific references to what defendant Williams did when I was using the he form or the him form pronouns would have cured any kind of misconception that I was trying to pin these additional criminal acts on defendant Batala. And this leads to the next point, Your Honor, which was that even if some misconduct were to have occurred, these two comments that are the focus of the challenge, which is not critical to the case. First, there were curative instruction given. Judge Raffitti instructed the jury that anything I said at the trial was not evidence. It was just argument. And besides that, the challenge statements are balanced against the fact that this defendant Batala placed herself at the center of the fraud, that the facts against her were strong. She stated, for example, that she prepared all the invoices for the fraudulent charges and she prepared a manual credit card, which is one of the old-time machines where it's run back and forth against the actual plastic card. But defendant Batala on testimony could not explain why the invoices, although for two particular invoices, although they matched down to the penny, the fraudulent charge, why the invoices item of products did not match the physical credit card's itemization of products. There was no explanation for that that she could give. She couldn't fully explain why it was. Also, how there were credit card charges in over $3,000 amounts within five minutes of each other when she had said that at the same time she took the customer's driver's licenses, ran the credit cards. Her testimony was not credible on that point. How could she have done all that if the transactions were only minutes apart? In her defense, she said, well, the customers never searched or never examined all these products that they were buying. It was another point that really seriously undercut her credibility because it just wasn't believable that customers would be traveling to the store and buying products in excess of $3,000 and not taking the time to examine whether the products that they had purchased were, in fact, inside the bag that she handed to them. And based on these facts that I just outlined, Your Honors, it's my position that the facts against her were strong and that these isolated comments, to the extent they were misconduct, are not grounds for reversal under the plain air standard. In addition, Your Honor, this case is not one of the situations similar to Bluford. In that case, the prosecutor argued the facts that he didn't have a good faith basis to believe. The facts giving rise to the good faith basis here were the fact that she placed herself straight at the middle of the crime, ran all the credit cards, prepared the invoices. The invoices did not match in two instances the corresponding credit card receipts, the manual credit card receipts. All right. Thank you. Does Your Honor want me to discuss anything about the obstruction of justice enhancement? Go ahead, if you like. Okay. Thank you, Your Honor. The Note 4 to 3C1.1 specifies that when the defendant is convicted of obstructive conduct in respect to the official prosecution, where there is a separate count of conviction for such conduct, the plus 2 enhancement applies. And the rationale for that is kind of better explained at Note 8, which is essentially that this rule is a rule of grouping. The actual 1,001 in this case or whatever obstructive conduct that forms the count will drop out, but it will be grouped into the underlying charge and then an automatic plus 2 will apply. And although there hasn't been a similar factual case in this circuit, the Fifth Circuit and the Eighth Circuit and the Second Circuit have addressed very similar factual circumstances and have upheld the plus 2 enhancement where there is a fraud that's committed and then a 1,001 statement or corresponding obstructive conduct count, the obstructive conduct count groups, but then there's a plus 2 enhancement to the underlying fraud. And this circuit applied a similar reasoning in Wills, which is cited in our briefs. The final point is the Booker-Blakely argument. Well, there's one other quick point I'd like to mention, but essentially the argument that's presented by Mr. Williams in his papers is similar to the one presented already in DuPas. He argues he's entitled to have these enhancements proven to a jury beyond a reasonable doubt. It is not error for the judge to actually find facts and enhance the sentence, so long as it's within a discretionary or non-mandatory guideline system. The way to remedy that is simply to remand under Ammoline. At that time when the government proposed the special verdict forms, it was done as an effort to try to predict the future, but it actually was not the law of the circuit. Ammoline had not yet been decided. Ammoline was decided, I think, in November, and this case concluded in July of last year. So for that reason, the government submits that the Ammoline remand will cure any problems raised by Mr. Williams in his brief and in his reply brief with respect to the Blakely issues. Simply to quote DuPas, DuPas points out, the defendant would prefer a remedy that limits the court's power to make findings a fact at all, and this court in DuPas rejected that. The final point, Your Honor, and I'm trying to get to this, is the Ortland issue. The district court, I conceded that the 2000 sentencing guidelines should have been used to calculate Mr. Williams' sentence. The fraud occurred in 2000 and 2001. The false statement that he was accused of occurred in 2003. And the ex post facto reasoning at that time was, look, under Ortland and other cases, it appears that the fraud should be calculated according to the book that was extant at the time of the fraud. We conceded that error again in our briefs, but I do want to suggest one alternative possibility at this time that occurred to me more recently, and that is the reasoning in DuPas at 419F3rd 920 specifically addresses the retroactivity of sentencing enhancements and distinguished that from the retroactivity of criminal liability. And made clear that ex post facto does not apply to retroactivity of sentencing enhancements, but does apply to criminal liability. Now, that suggests there's a tension between Ortland and DuPas, but it is a plain error review. And perhaps then, therefore, that there is no miscarriage of justice to conclude that the retroactivity application of the 2003 guidelines is not a constitutional violation, that there would be no miscarriage of justice. All right. Thank you. Thank you, Your Honors. Your Honors, if the Court ends up vacating the sentence, then I need not reach the argument of the obstruction of justice. Because I would have a new argument on that before the District Court. But because I don't know what this Court's going to do, I would like to say that the conviction that Mr. Williams suffered under 18 U.S.C. 1001 did not require proof that the statement significantly impeded the investigation. And it is our argument that that is a prerequisite for the additional points under Note 4 in the guidelines. I think there is case law that if an ex post facto error occurred, there's plain error and the matter would be remanded. What makes it a little bit awkward for me to say that now, I think, is that because it's a guidelines issue as well, the government could always argue, well, under Booker, the Court can consider that and we're just going to send it back for a reasonable sentence that can be done with a limited remand. I'd ask the Court, for the reasons I stated earlier, to find that that is not appropriate in this case, that the ex post facto issue is only one issue of many errors in this case that occurred in sentencing, which I've already recited in my opening argument. The government's argument that this can be corrected in some fashion is reminiscent of a school boy who would bring his teacher a beautiful apple and the teacher, upon biting into the apple, would see a worm crawling through it and would say, I can't eat the apple because it's got a worm in it. And the school boy might say, no, no, no, it's a good apple. It's an organic apple. Eat around the worm. Just eat the good part. And, of course, that apple would be rejected by any person. The sentencing hearing that occurred in this case was riddled with error, and we'd ask this Court to reject it in toto and vacate the sentence and remand for a full resentencing. Thank you. You know, I eat about five apples a day. I've never hit a worm yet. Now, every time I take a bite, I keep thinking of you. I apologize. Anything else? All right. I want you to just remain for a minute. Is the teacher here with the group? Yeah. Do you want to tell us a little bit about the school and the bright young students you have? We're a middle school. We're down in Del Mar and Madre, right down the street from PCC. And we're a middle school, and I'm actually a world history teacher, but I get to teach an elective. And it's a debate class, and it's centered around U.S. Supreme Court law, so they're actually reading case law and reading the structures of the Federal Circuit Court. And so we're here for our first oral argument. We're glad you're here. And we had some exciting cases earlier. But the next one that we have is that insurance coverage matter. We've got a bankruptcy matter involving a freight company, and then we have another investment matter. But, you know, the important thing, I think one of the best preparations my father gave me as far as being a judge is concerned is just to be able to sit hour after hour after hour and stay awake and listen. And it's good training for the soul and for the persistence you need. So you have a very bright class. I can see they're all wide awake and they're interested in every word we say. And we'll try to keep our voices up. If you like, I could ask some of the attorneys just to tell you what their roles are. Would you like that? Just take a minute. Introduce yourself. Tell us where you went to school. Did you go to the Del Mar School? No, I did not. All right. Go ahead. This is your chance. Well, tell us who the judge was and where Wilson High School is and what your name is. Wilson High School is just in San Gabriel Valley in Hacienda Heights. Well, there's another Wilson High School in El Sereno. Not that one, Your Honor. All right. Okay. Well, I wanted to clear that up. Yeah, go ahead. I clerked for a judge. I clerked for California Supreme Court Justice Carlos Moreno when he was a district court judge before he was elevated to the Supreme Court. And then I began working here at the U.S. Attorney's Office. I prosecute. This is a fraud case, but I do a lot of major narcotics cases. Methamphetamine, cocaine. We use wiretaps to find out what criminals are doing.  And this is a very rare honor for a prosecutor to do, to come to the Ninth Circuit and argue a case. It's a great opportunity, and when you're in civil practice and you're as young as I am, you usually don't get to do that. I'm still learning, as I'm sure the Court has noticed. But I think that's it. All right. Landau. Hello. I'm Sharon Landau, and I went to Hollywood High. I grew up in Hollywood. And I went to college in Ferguson and Washington. And in college I did my job. I'm a defense lawyer. I represent the person that Mr. Martinez is trying to lock up in jail. And that's what I do. So my job is to represent the defendant's interests and to advocate for the defendant. And sometimes I have a strong case, and sometimes I don't. But my job is to represent the defendant, no matter what, and to do my best for that person. A lot of defense attorneys, we like to think of ourselves as defending the Constitution. We try to protect everybody's constitutional rights and to prevent the government from doing things that we don't think they should be doing. My wife's half the people in my family. They let the cat out of the bag, you know. That's what I do. Brian Guess. I grew up in San Francisco in my office. Pepperdine University. Where'd you go to law school? I went to Pepperdine University in Alabama. In the law school there? So you're a surfer? No, I'm not really a water surfer. Let's try to do this in San Francisco. I view the role of the appellate lawyer as reviewing the records that's made in the trial court. When you see those trials on television, it's always important to take those things down and connect to the court. And the appellate lawyer, when there's a conviction, can review the testimony and the procedure to decide whether or not the trial was real, to see whether or not the person who had the trial was treated fairly. There are presently 15,000 cases. The 9th Circuit is the circuit that we're in. This is the 9th Circuit Court. This is the 9th Circuit Court. My office is the only 9th Circuit Court in the United States. 25 years of experience in the 9th Circuit Court. My argument is that in order to get a trial, you need to get a report. I have a court in the country that does that for me. It's part of the reason why I'm here. Excellent, excellent. I should have said that. I'd just like to add, in all fairness, I did used to work for the 9th Circuit. Not that they're going to, but not that that means the judges. That's not going to affect how the judges do it. As long as they do it faster.
judges: Pregerson, Noonan, Thomas